IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RONALD R. SOWIZROL, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    -against-<br><br>THE COCA-COLA COMPANY and COCA-COLA REFRESHMENTS USA, INC.<br><br>    Defendants. | **Case No.**<br><br>**CLASS ACTION AND REPRESENTATIVE ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF**<br><br><u>**JURY TRIAL DEMAND**</u> |

Plaintiff RONALD R. SOWIZROL ("Plaintiff"), individually, and on behalf of similarly situated persons, through their undersigned attorneys, brings this lawsuit against defendants The Coca-Cola Company and Coca-Cola Refreshments USA, Inc. (collectively "Defendants").

<u>**PRELIMINARY STATEMENT**</u>

1.    This case is about Coca-Cola, one of the most famous and respected brands in the world.  Faced with clear evidence that it was losing market share because consumers increasingly preferred beverages without artificial flavoring and chemical preservatives, The Coca-Cola Company, owner of the brand, responded not by providing consumers with what they wanted -- a natural and healthy drink -- but by deceiving them into thinking that Coca-Cola was natural and healthy when in fact it contained artificial flavoring and chemical preservatives.  This choice by The Coca-Cola Company was not just an example of bad corporate citizenship.  It also clearly violated federal and state laws specifically prohibiting the precise kind of misbranding and misleading behavior exhibited by The Coca-Cola Company.

2.    The Coca-Cola Company is the world's largest beverage company.  Its product, Coca-

Cola,[1] is the world's most popular soft drink and is one of the most well-known and trusted brand names in the world. Sales of Coca-Cola, however, are fueled by false and deceptive representations that Coca-Cola is not only a healthy product, but one free of artificial flavoring and chemical preservatives. Every container of Coca-Cola sold in the United States either falsely states that it does not contain artificial flavoring and chemical preservatives, or fails to affirmatively state - - as required by state and federal law - - that it, in fact, contains both artificial flavoring and chemical preservatives.

3.      Advertisements containing the "Coca-Cola" brand name are ubiquitous throughout the country. There are few places in the United States where it is not prominently displayed on billboards, television and radio advertisements, and in-store displays. Defendants leverage this brand name to sell millions of containers of Coca-Cola. Through their advertising efforts, Defendants portray Coca-Cola as an all-American product. They also falsely portray Coca-Cola as a healthy and all-natural product.

4.      Indeed, The Coca-Cola Company's own website directs consumers to the website of The Coca-Cola Company Beverage Institute for Health & Wellness, which portrays Defendants' products, including Coca-Cola, as an integral part of a healthy diet and an excellent means of maintaining proper hydration. The website specifically states that: "Global in scope, the Beverage Institute for Health & Wellness (BIHW) is part of The Coca-Cola Company's ongoing commitment to use evidence-based science to advance knowledge and understanding of beverages, beverage ingredients, and the important role that active healthy lifestyles play in supporting health and wellbeing." *See* http://beverageinstitute.org/us/about-us/.

---

[1]      For the avoidance of any confusion, by "Coca-Cola," Plaintiff mean that specific soft drink that is commonly sold by Defendants in red cans or bottles containing red labels, and that is sometimes referred to by Defendants as the "original formula." As used herein, the term "Coca-Cola" is not meant to include any distinct soft drinks, such as Diet Coke, Cherry Coke, or Caffeine Free Coca-Cola, which may have similar names.

5.      It goes so far as to recommend that Defendants' products, including Coca-Cola, should specifically be used to maintain the health and well-being of children. It states: "Studies suggest that active children consume more fluids and stay better hydrated when the liquid is flavored. Beverages that are sweetened with caloric sweeteners or with low- and no-calorie sweeteners can be an important contributor to hydration, providing a sweet taste that encourages a child to consume more fluid." *See* http://beverageinstitute.org/us/article/special-considerations-for-children/.

6.      Defendants' concerted efforts to employ false and deceptive labeling practices to mislead consumers into thinking Coca-Cola is natural and healthy, when in fact it is neither, did not occur by accident. Rather, it was a response to changing consumer preferences, which were causing Coca-Cola, as well as other carbonated soft drinks, to lose market share.

7.      By 2008, Defendants realized they had a significant problem. Sales of carbonated sodas were precipitously dropping and reached their lowest levels since 1997.   *See* Jessica Wohl, *U.S. Soft-Drink Volume Decline Steepest in Decades*, Reuters, Mar. 30, 2009.

8.      Worse still, consumers were not only buying and drinking less soda, they were switching to other beverages entirely. Studies showed that because soda was associated with empty calories and artificial ingredients, consumers were fundamentally changing their drinking habits. One leading study showed that between 2003 and 2008 the regular carbonated soft drink market lost 15.6 million adult drinkers.   Marketing research showed that consumers were increasingly interested in all natural foods that did not contain chemical preservatives or artificial flavors. *See Classic Soft Drinks Fall Out of Favor*, Mar. 30, 2009 (available at http://www.mintel.com/press-centre/food-and-drink/classic-soft-drinks-fall-out-of-favor).

9.      These developments were a major concern for Defendants because their beverage business, and their flagship Coca-Cola brand, contained chemical preservatives and artificial flavorings.

10. Defendants were aware that sales were declining because, as established by consumer surveys, an overwhelming majority of consumers correctly and accurately perceived their products to be unnatural, artificial and chemically preserved. This critical fact was compounded as competitors like Pepsi and Red Bull began introducing new cola products that were being touted as "all natural" or "100% natural" and which lacked certain artificial ingredients, like the phosphoric acid the Defendants used to artificially flavor and chemically preserve their Coca-Cola products.

11. The situation so substantially affected Defendants that the Coca-Cola Company's Chief Marketing and Commercial Officer referred to these changes in consumer preferences as a "category five" hurricane that was "really bearing down on us." *See* FD (Fair Disclosure) Wire, *The Coca Cola Company Analyst Meeting Day 1*, Nov. 16, 2009. He went on to note that: "That is not a fad. Consumers who classify themselves as LOHAS [Lifestyles of Health and Sustainability] or those who value natural ingredients represent in some markets 35% of the total market." *Id.*

**The Pemberton Campaign**

12. Rather than reformulate Coca-Cola and their other soft drinks to appeal to these changing consumer preferences for natural and healthy beverages, Defendants adopted a global campaign of disinformation, false advertising, false labeling and misbranding, dubbed "Pemberton" after the pharmacist who invented Coca-Cola. This campaign was designed to fool consumers into the erroneous belief that their products were not artificially flavored or chemically preserved. In so doing, they not only misled and deceived consumers but, as described below, broke a number of federal and state food labeling laws designed to protect consumers from such illegal and deceptive practices.

13. The main goal of the Pemberton campaign was, as admitted at the time by the Global Brand Director of Coca-Cola, to falsely represent to consumers that Coca-Cola never had, and never would, add chemical preservatives or artificial flavorings. "'Pemberton' is more fact-based,

-4-

affirming for consumers that Coca-Cola never has had, and never will have, added preservatives or artificial flavors." *See Coke Campaign Focuses on What's Not in the Can; 'No Added Preservatives or Artificial Flavors,'* *New York Times*, Aug. 6, 2008.

14. As part of the campaign, Defendants placed false statements on product labels of, for example, two-liter bottles and 12-pack and 24-pack cartons of Coca-Cola, including "no artificial flavors. no preservatives added. since 1886." This statement, as well as the entire premise of the Pemberton campaign, was false and misleading.

15. In fact, Coca-Cola contains phosphoric acid. Phosphoric acid is both an artificial flavoring and a chemical preservative.

16. Also false was the prominent representation on Coca-Cola containers and advertisements that Coca-Cola is still made with the "original formula" devised by Pemberton in 1886. In fact, the composition of Coca-Cola has repeatedly changed over time. These changes have included, among other things, an increase in the amount of unhealthy ingredients like sugar and corn syrup and the addition of artificial ingredients like phosphoric acid. *See Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Company*, 563 F. Supp. 1122, 1131 (D. Del. 1983).

17. Ignoring the falsity of their statements and labeling, Defendants conceded that Pemberton was designed to deceive consumers by misrepresenting that Coca-Cola does not use chemical preservatives or artificial flavorings. According to one of Defendants' marketing directors: "When we talked to consumers about Coke, we realized they did not know that it has no added preservatives or artificial flavors. We felt it was important to reassure Coke drinkers of this fact." *See Coke Campaign Focuses on What's Not in the Can; 'No Added Preservatives or Artificial Flavors,'* New York Times, Aug. 6, 2008.

18. Similarly, a regional marketing director for a Coca-Cola entity was quoted as saying: "Our research has highlighted that there is a need and an opportunity to remind consumers that Coca-

Cola is the 'real thing.' The Pemberton campaign is simply about letting consumers know that the formula for Coca-Cola has not changed for more than 120 years." *See Coca-Cola: New and Improved? Nope, Still the Same*, MARKETING MAGAZINE, Sept. 5, 2008.

19.     The Coca-Cola Company's own CFO, Gary Fayard, made the following statement at a consumer conference held on September 3, 2008:

> North America, it's the one last market we really need to turnaround. We acknowledge it but we've got some very good plans to do that. We think we know what we need to do. We needed to fix our marketing and we think we've done that. We've got very good marketing in the US now. We've started what we call Project Pemberton. This is about sparkling beverages. It will be print. You'll see it soon. It will be print but it's actually re-educating the consumer, and I don't know that you can read what it says there but it says "No preservatives added, no artificial flavors since 1886. Never has, never will". And if you think about the new teenagers today and young adults as they've grown up and there's just an explosion of choices they didn't grow up with their limited choices like I did and maybe they've forgotten that Coke actually was born in 1886 and there weren't artificial ingredients back then. This is all pretty natural stuff and we're just -- to remind people.

*See* The Coca-Cola Company at Lehman Brothers Back-to-School Consumer Conference, *FD (Fair Disclosure) Wire*, Sept. 3, 2008.

20.     Additionally, Defendants concealed the fact that their Coca-Cola products contained artificial flavors and chemical preservatives by failing to make legally mandated labeling disclosures detailing  the function of ingredients like phosphoric acid that are used as artificial flavorings and chemical preservatives in those products.

21.     Under both federal and state law, Defendants are required to disclose the presence of artificial flavoring and chemical preservatives in food products.  Defendants are also required to clearly state the function of any ingredient that is used as either an artificial flavoring or a chemical preservative.

22.     Nowhere on any Coca-Cola product does the label identify the function of phosphoric acid.

23.     Nowhere on any Coca-Cola product does the label state that the product contains artificial flavoring or chemical preservatives.  In fact, many containers of Coca-Cola affirmatively state that they do not contain any artificial flavoring or chemical preservatives.

24.     Such false statements and omissions violate both federal law and Illinois state law and render these products illegally misbranded.  These products cannot be lawfully manufactured, distributed, or sold to consumers.

25.     The Food, Drug & Cosmetic Act ("FDCA") and regulations promulgated thereunder bar food manufacturers and distributors like Defendants from selling misbranded and illegal products that contain labels that fail to accurately disclose the nature of their contents.

26.     The FDCA and regulations promulgated thereunder are expressly adopted in Illinois's Illinois Food, Drug and Cosmetic Act ("IFDCA"). *See* 410 ILCS 620/1, *et seq.*  Therefore, any labeling violation of the FDCA, by definition, is also a violation of the IFDCA.  In addition, Illinois has adopted its own independent labeling requirements that are parallel to federal regulations and impose requirements identical to federal regulations.

27.     Under federal and Illinois state law, products such as Coca-Cola are "misbranded" if their "labeling is false or misleading in any particular" or does not contain certain information on its labeling.  *See* 21 U.S.C. § 343(a); 410 ILCS 620/11.

28.     Coca-Cola products are misbranded under both federal and Illinois law, *inter alia*, because they fail to disclose on their labeling that they contain artificial flavors or chemical preservatives.  *See* 21 U.S.C. § 343(k); 410 ILCS 620/11 (k).

29.     Because the manufacture and sale of Coca-Cola violates the IFDCA, the actions of Defendants also constitute predicate acts under Illinois's consumer protection laws, including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA").

30.     Defendants are major international food manufacturers and are well aware of the

requirements of federal and state laws.  Yet, they have chosen to ignore those laws in order to increase sales and profits at the expense of consumers, including Plaintiff.

31.     In order to conceal from consumers (including Plaintiff) that Coca-Cola and other soft drinks include artificial flavorings and chemical preservatives, Defendants have knowingly and intentionally failed to disclose the existence of these chemicals in their products and have thus misled consumers, including plaintiff, about the ingredients in Coca-Cola and other soft drinks.

32.     Plaintiff, individually, and on behalf of other consumers who purchased Coca-Cola, now brings this action, not only to recover damages, but to stop Defendants from continuing to engage in such unlawful actions and from continuing to deceive consumers.

## PARTIES

33.     Plaintiff Ronald R. Sowizrol is a resident of Inverness, Illinois.

34.     Plaintiff purchased more than $25.00 worth of Coca-Cola within the four years preceding the filing of this action (the "Class Period").

35.     Upon information and belief, Defendant The Coca-Cola Company is a Delaware corporation, with its principal place of business at One Coca-Cola Plaza, Atlanta, Georgia.

36.     It has the world's largest beverage distribution system.  More than 1.8 billion servings of its products are consumed every day.

37.     Upon information and belief, defendant Coca-Cola Refreshments USA, Inc. is a Delaware corporation with its principal place of business at One Coca-Cola Plaza, Atlanta, Georgia.

38.     Upon information and belief, defendant Coca-Cola Refreshments USA, Inc. is The Coca-Cola Company's bottling and customer service organization for North America.

39.     Coca-Cola Refreshments USA, Inc. manufactures, distributes, and sells approximately 88 percent of The Coca-Cola Company's unit case volume in the United States.  Upon information and belief, this includes Coca-Cola.

## JURISDICTION AND VENUE

40.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) a member of the class of Plaintiff is a citizen of a State different from a defendant; and (3) the number of members of all proposed plaintiff classes in the aggregate is greater than 100.

41.     The Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged herein occurred in Illinois.  Defendants also have sufficient minimum contacts with Illinois, and have otherwise intentionally availed themselves of the markets in Illinois through the promotion, marketing, and sale of products sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

42.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims occurred in this District, a substantial part of the property that is the subject of this action is situated in this District, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTS RELEVANT TO ALL CLAIMS

### Coca-Cola products are misbranded and illegal

43.     All containers of Coca-Cola sold in the United States are misbranded and illegal.

44.     Defendants knowingly and intentionally sold these misbranded products to consumers (including Plaintiffs) with the intent to deceive.

45.     Plaintiff purchased Coca-Cola within the Class Period in Illinois.

46.     Plaintiff Ronald R. Sowizrol's purchases of Coca-Cola included Coke, Diet Coke, Caffeine Free Coke, and Sprite, in 2 liter bottles, 20 ounce bottles, and individual and various packages of 12 ounce cans.

47.     All containers of Coca-Cola fail to state that any Coca-Cola ingredients are used as artificial flavoring or as a chemical preservative.

48.     Labels on 2 liter bottles, 24-packs of 12 ounce cans, and 12-packs of 12 ounce cans of Coca-Cola state, "no artificial flavors.  no preservatives added.  since 1886."

49.     The ingredients in Coca-Cola include phosphoric acid.

**Phosphoric acid is an artificial flavoring**

50.     Phosphoric acid is an artificial flavoring.

51.     The Coca-Cola Company's own website states: "Phosphoric acid is a used in certain soft drinks, including Coca-Cola, to add tartness to the beverage."  *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

52.     The Coca-Cola Company's website also discusses acidulants such as phosphoric acid and states that acidulants are: "Acids, which include phosphoric acid and citric acid, and acidic salts help to provide flavoring. They are responsible for the tart taste which helps to balance the sweetness. They also help to reduce the growth of microorganisms (i.e., protect the food from spoiling)." *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

53.     Previously, these definitions were found at http://productnutrition.thecoca-colacompany.com/ingredients.  Defendants recently moved these definitions to the website of the affiliated The Coca-Cola Company Beverage Institute for Health & Wellness.

54.     Further, the board of directors of the American Beverage Association (which is a leading trade association for soda manufacturers) is chaired by an officer of a Coca-Cola entity. Seven officers of The Coca-Cola Company or affiliated entities are board members of the American Beverage Association.

55.     The American Beverage Association website defines "Phosphoric Acid" in the following manner: "This flavoring agent in soft drinks is a preservative that provides tartness." *See* http://www.ameribev.org/resources/beverage-industry-terms/.

56.     21 C.F.R. § 101.22(a)(1) provides that, "The term *artificial flavor* or *artificial flavoring* means any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof.

57.     Similarly, the Coca-Cola Company's website defines "artificial flavors" as "substances used to impart flavor that are not derived from a natural substance such as a spice, fruit or fruit juice, vegetables or herbs." *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

58.     The function of phosphoric acid in Coca-Cola, in part, is to impart flavor.

59.     Phosphoric acid is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof.

60.     Therefore, phosphoric acid is an artificial flavoring under 21 C.F.R. § 101.22(a)(1). Phosphoric acid also meets Defendants' own definition of "artificial flavor."

61.     Phosphoric acid also does not meet the criteria to be a natural flavoring.

62.     21 C.F.R. § 101.22(a)(3) provides that, "The term *natural flavor* or *natural flavoring* means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional.

63.     Similarly, the website of Defendants or affiliated entities defines "natural flavors" as follows: "Natural flavors are derived from the essential oils or extracts of spices, fruits, vegetables and herbs." *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

64.     Phosphoric acid is not an essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof.

65.     Therefore, phosphoric acid is not a "natural flavor," as defined in 21 C.F.R. § 101.22(a)(3).  Nor does it meet the Defendants' own definition of a natural flavor.

**Phosphoric acid is a chemical preservative**

66.     Phosphoric acid is also a chemical preservative.

67.     21 C.F.R. § 101.22(a)(5) provides that, "The term *chemical preservative* means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

68.     Phosphoric acid is not a common salt, sugar, vinegar, spice, or oil extracted from spices, nor is it a substance added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

69.     As used in Coca-Cola, phosphoric acid prevents or retards deterioration of the product.

70.     Therefore, phosphoric acid is a "chemical preservative," as defined in 21 C.F.R. § 101.22(a)(5).

**Coca-Cola products are misbranded and illegal**

71.     Because Coca-Cola contains artificial flavoring and chemical preservations, Coca-Cola product labels are required to state the presence of such artificial flavoring and chemical preservations and must specifically identify the function of phosphoric acid, as used in Coca-Cola.

72.     21 C.F.R. § 101.22(c) provides that "[a] statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food or on its container or wrapper, or on any two or all three of these, as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food."

73.     It further provides that "[a] food to which a chemical preservative(s) is added shall …bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., "preservative", "to retard spoilage", "a mold inhibitor", "to help protect flavor" or "to promote color retention."

74.     Containers of Coca-Cola do not have a statement that they contain artificial flavoring.

75.     Containers of Coca-Cola do not have a statement that they contain chemical preservatives.

76.     Containers of Coca-Cola do not specify the function of phosphoric acid, as used in the product.

77.     Because Coca-Cola containers do not have labels with statements that they contain artificial flavoring or chemical preservatives, they are misbranded under both the FDCA and the IFDCA.

78.     Because Coca-Cola containers do not have labels with statements that the function of phosphoric acid therein is as an artificial flavor or chemical preservative, they are misbranded under both the FDCA and the IFDCA.

79.     Certain Coca-Cola containers (2-liter bottles, 24-packs of 12 ounce cans, and 12-packs of 12 ounce cans) also contain the affirmative statement that there are "no artificial flavors. no preservatives added."

80.     This statement is false.

81.     Defendants knowingly and intentionally failed to include statements on containers of Coca-Coca regarding the presence of artificial flavoring and chemical preservatives, despite the fact that Coca-Cola contains artificial flavoring and chemical preservatives.

82.     Defendants knowingly and intentionally falsely stated that Coca-Cola has "no artificial flavors. no preservatives added," despite the fact that Coca-Cola contains artificial flavoring and chemical preservatives.

83.     Because these Coca-Cola containers falsely represent that they contain no artificial flavors or preservatives, they are misbranded under both the FDCA and the IFDCA.

84.     Defendants have violated 21 C.F.R. § 101.22, 21 U.S.C. § 343(a), and 21 U.S.C. § 343(k), all of which are adopted by and incorporated into the IFDCA.

85.     Defendants have also violated 21 C.F.R. § 1.21 by, *inter alia*, failing to reveal material facts on the labels of Coca-Cola containers.

86.     Defendants have also, *inter alia*, violated the following IFDCA provisions.

87.     Defendants have violated 410 ILCS § 620/11(k) because Coca-Cola products bear or contain artificial flavoring, artificial coloring, or chemical preservative without labeling stating that fact.

88.     Defendants have violated 410 ILCS § 620/3.5, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

89.     Defendants have violated 410 ILCS § 620/11(f) because words, statements, or other information required pursuant to the IFDCA to appear on the label or labeling are not prominently placed upon the label or labeling with conspicuousness, as compared with other words, statements, designs, or devices in the labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

90.     Defendants have violated 410 ILCS § 620/3.1, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

91.     Defendants have violated 410 ILCS § 620/3.2, which makes it unlawful for any person to misbrand any food.

92.     Defendants have violated 410 ILCS § 620/3.3, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer any such food for delivery.

93.     Defendants have violated 410 ILCS § 620/11(a) because, for all the reasons set forth herein, Coca-Cola labeling is false and misleading in one or more ways.  Among other things, the labeling is false and misleading because it: fails to identify the presence of chemical preservatives and artificial flavors; affirmatively misrepresents that there are "no artificial flavors"; affirmatively misrepresents that there are "no preservatives added"; and falsely states that Coca-Cola is made with the same original formula used "since 1886."

94.     Defendants have a duty to disclose the true nature of the contents of Coca-Cola and failed to abide by that duty.

95.     Significantly, under 21 U.S.C. § 333(a)(1) and 410 ILCS 620/5(a), Defendants' violations of the FDCA and IFDCA (including all of the aforementioned provisions) are strict liability crimes for which no showing of intent to deceive or defraud is required.

96.     Under both the FDCA and the IFDCA, it is a strict liability crime to, *inter alia*, manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

97.     By manufacturing and selling misbranded products, Defendants have committed a predicate unlawful act, regardless of any misrepresentation or reliance thereon.

98.     Because Defendants' products are misbranded and illegal they have a value of zero.

99.     Plaintiff and other consumers were injured when paying money for a worthless product.

**Purchasers of Misbranded Products Have Been Injured**

100.    Had Plaintiff known that Coca-Cola was misbranded, he would not have purchased Coca-Cola.

101.    Had Plaintiff known that Coca-Cola was an illegal product, he would not have purchased Coca-Cola.

102.    Had Plaintiff known that Coca-Cola violated federal and state laws and regulations, he would not have purchased Coca-Cola.

103.    Plaintiff did not know that phosphoric acid was a chemical preservative or an artificial flavoring.

104.    Had Plaintiff known that Coca-Cola contained artificial flavoring, he would not have purchased Coca-Cola.

105.    Had Plaintiff known that Coca-Cola contained chemical preservatives, he would not have purchased Coca-Cola.

106.    Because Coca-Cola products are illegal and misbranded, they are economically worthless.

107.    Because Coca-Cola products are illegal and misbranded, they cannot be lawfully resold.

108.    Plaintiff paid money for Coca-Cola products that, under applicable law, were worth nothing.

109.    Had Plaintiff known that Coca-Cola was economically worthless, he would not have purchased Coca-Cola.

110.    Had Plaintiff known that Coca-Cola could not be lawfully resold, he would not have purchased Coca-Cola.

111.    Plaintiff could have purchased cheaper alternative products that were not illegal, misbranded, and worthless.

112.    Plaintiff paid an unwarranted premium for Coca-Cola over cheaper alternative products that were not illegal, misbranded, or worthless.

113.    Plaintiff relied on the Coca-Cola labels to his detriment.

114.    Plaintiff's reliance was reasonable.

115.     A reasonable consumer would have been misled by the Defendants' actions.

116.    As a result of Defendants' unlawful misrepresentations, Plaintiff and millions of others in Illinois and throughout the United States purchased Coca-Cola.

117.    Plaintiff and millions of others in Illinois and throughout the United States who purchased Coca-Cola were injured as a result of Defendants' actions.

118.    Plaintiff and other purchasers of Coca-Cola paid money for products that were worth zero.

119.    Plaintiff and other purchasers of Coca-Cola paid money for products that were of a lesser value and quality than represented by Defendants.

120.    Plaintiff and other purchasers of Coca-Cola also paid an unwarranted premium above alternative products that were not illegal, misbranded, or worthless.

## **CLASS ACTION ALLEGATIONS**

121.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in Illinois who, within the Class Period, purchased Coca-Cola.

122.    The following persons are expressly excluded from the Class: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

123.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

124.    **Numerosity**:  Based upon Defendants' publicly available sales data with respect to Coca-Cola, it is estimated that the Class numbers are potentially in the millions, and that joinder of all Class members is impracticable.

125.    **Common Questions Predominate**:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

    a.    Whether Defendants engaged in unfair, unlawful or deceptive business practices by failing to properly package and label Coca-Cola sold to consumers;

    b.    Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

    c.    Whether Defendants made unlawful and misleading claims regarding artificial flavoring and preservatives in Coca-Cola;

    d.    Whether Defendants unlawfully sold misbranded products in violation of the FDCA and the IFDCA;

    e.    Whether Defendants violated Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505/1, *et seq.*;

  f.  Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

  g.  Whether Defendants' unlawful, unfair and deceptive practices harmed Plaintiff and the Class; and

  h.  Whether Defendants were unjustly enriched by their deceptive practices.

126. **Typicality**: Plaintiff's claims are typical of the claims of the Class because Plaintiff bought Defendants' Purchased Products during the Class Period. Defendants' unlawful, unfair, and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of each member of the Class were caused directly by Defendants' wrongful conduct. In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

127. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel has any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent Plaintiff's interests and those of the members of the Class. Plaintiff and Plaintiff's counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

128. **Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment

of Class members' rights and the disposition of their interests through actions to which they are not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would create. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

129.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive or equitable relief with respect to the Class as a whole.

130.    The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

131.    Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

132.    Plaintiff is a member of the Class he seeks to represent.  Plaintiff's claims are typical of the Class members' claims.  Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's claims are typical and representative of the Class.

133.    There are no unique defenses which may be asserted against Plaintiff individually, as distinguished from the Class.  The claims of Plaintiff are the same as those of the Class.

134.    No conflicts of interest exist between Plaintiff and the other Class members. Plaintiff has retained counsel that is competent and experienced in complex class action litigation. Plaintiff and his counsel will fairly and adequately represent and protect the interests of the Class.

135.    This class action is superior to any other method for the fair and efficient adjudication of this dispute.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
**815 ILCS 505/1 *et seq.***

136.    Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

137.    This Count is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

138.    Defendants sold Coca-Cola in Illinois and throughout the United States during the Class Period.

139.    Defendants offered Coca-Cola for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials.

140.    These materials misrepresented and/or omitted the true contents and nature of Coca-Cola.

141. Defendants prepared and distributed within Illinois and nationwide via product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the composition and nature of Coca-Cola.

142. Defendants are corporations and, therefore, are "persons" within the meaning of 815 ILCS 505/1 (c).

143. Coca-Cola constitute "merchandise" within the meaning of 815 ILCS 505/1 (b)

144. Defendants' advertisements and inducements made within Illinois and throughout the United States come within the definition of "advertisements" as contained in 815 ILCS 505/1 (a) in that such product packaging, labeling, and promotional materials were intended as inducements to purchase Coca-Cola and are statements disseminated by Defendants to Plaintiff and the Class that were intended to reach members of the Class.

145. Defendants' sales of Coca-Cola within Illinois and throughout the United States meet the definition of "sale" within the meaning of 815 ILCS 505/1 (d).

146. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, provides in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

147. Defendants' acts and practices regarding the labeling and misbranding of Coca-Cola as alleged above, were deceptive, fraudulent, under false pretense, under false promise, a misrepresentation, concealment, suppression or omission.

148.   The deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission of material facts alleged in the preceding paragraphs occurred in connection with Defendant's conduct of trade or commerce in Illinois and throughout the United States

149.   Plaintiff and the Class were the intended targets of such representations.

150.   Plaintiff and the Class were misled and deceived.

151.   Defendants have engaged in unfair and deceptive business acts and practices.

152.   Plaintiff and the Class were injured by Defendants' unfair and deceptive business acts and practices.

153.   Defendants' deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission caused Plaintiff and the Class to purchase Coca-Cola that they would otherwise not have purchased had they known the true nature of these products.

154.   Defendants sold to Plaintiff and the Class products that were not capable of being sold legally, and which have no economic value.

155.   Plaintiff and the Class were injured when they paid good money for these illegal and worthless products.

156.   As a result of Defendants' unlawful business practices, Plaintiff and the Class, pursuant to 815 ILCS 505/10a are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to Plaintiff and any Class member any money paid for Coca-Cola.

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Food, Drug and Cosmetic Act**
**410 ILCS 620/1 *et seq.***

157.   Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

158.    All containers of Coca-Cola are misbranded.

159.    Pursuant to the IFDCA, 410 ILCS 620/3.1, it is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

160.    Pursuant to the IFDCA, 410 ILCS 620/3.2, it is unlawful for any person to misbrand any food.

161.    Pursuant to the IFDCA, 410 ILCS 620/3.5, it is unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

162.    Pursuant to the IFDCA, 410 ILCS 620/3.5, it is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer any such food for delivery.

163.    The IFDCA, 410 ILCS 620/11, provides that a food is deemed misbranded:

    (a)    If its labeling is false or misleading in any particular…

    (d)    If its container is so made, formed, or filled as to be misleading…

    (f)    If any word, statement, or other information required by or under authority of this Act to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, or designs, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use…

    (k)    If it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact.

164.    All containers of Coca-Cola are misleading in a particular.

165.    All containers of Coca-Cola are made as to be misleading

166.    All containers of Coca-Cola do not have words, statements or other information required under the IFDCA.

167.    All containers of Coca-Cola bear or contain artificial flavoring and chemical preservatives without bearing a label stating such facts.

168.    Plaintiff and the Class purchased such misbranded containers of Coca-Cola.

169.    Defendants sold to Plaintiff and the Class products that were not capable of being sold legally, and which have no economic value.

170.    Plaintiff and the Class members would not have purchased Coca-Cola had they been aware that it was illegal to sell, violated state and federal law, was misbranded, was economically worthless and contained chemical preservatives and artificial flavoring.

171.    Plaintiff and the Class members were harmed as a result of the purchase of Coca-Cola and are entitled to damages, including the amounts spent on Coca-Cola and punitive damages.

## THIRD CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability

172.    Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

173.    Implied in the purchase of Coca-Cola by Plaintiff and the Class is the warranty that the purchased products are legal and can be lawfully resold.

174.    Defendants knowingly and intentionally misbranded Coca-Cola products.

175.    Defendants knew those Coca-Cola products were illegal.

176.    When Defendants sold those products they impliedly warranted that the products were legal and could be lawfully resold.

177.    Plaintiff would not have knowingly purchased products that were illegal and unsellable.

178.    No reasonable consumer would knowingly purchase products that are illegal and unsellable.

179.    The purchased Coca-Cola products were unfit for the ordinary purpose for which Plaintiff and the Class purchased them.

180.     In fact, these Coca-Cola products were economically worthless.

181.     As a result, Plaintiff and the Class were injured through their purchase of an unsuitable, useless, illegal, and unsellable product.

182.     By reason of the foregoing, Plaintiff and the Class were damaged in the amount they paid for Coca-Cola products.

**FOURTH CAUSE OF ACTION**
<u>**Negligent Misrepresentation**</u>

183.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

184.     In making representations of fact to Plaintiff and the other Class members about their Coca-Cola products, Defendants failed to fulfill their duties to disclose the material facts alleged above. Among the direct and proximate causes of said failure to disclose were the negligence and carelessness of Defendants.

185.     Plaintiff and the other Class members, as a direct and proximate cause of Defendants' breaches of their duties, reasonably relied upon such representations to their detriment. By reason thereof, Plaintiff and the other Class members have suffered damages in an amount to be proved at trial.

**FIFTH CAUSE OF ACTION**
<u>**Negligence**</u>

186.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

187.     In making representations of fact to Plaintiff and the other Class members about their Coca-Cola products, Defendants failed to fulfill, lawfully label, or advertise their products their Coca-Cola products and violated their duties to disclose the material facts alleged above. Among the direct and proximate causes of said failure to disclose were the negligence and carelessness of Defendants.

188.    Plaintiff and the other Class members, as a direct and proximate cause of Defendants' breaches of their duties, reasonably relied upon such representations to their detriment. By reason thereof, Plaintiff and the other Class members have suffered damages.

189.    As described above, Defendants' actions violated a number of express statutory provisions designed to protect Plaintiff and the Class. Defendants' illegal actions constitute negligence *per se*. Moreover, the statutory food labeling and misbranding provisions violated by Defendants are strict liability provisions.

190.    As alleged above, Plaintiff and the Class were injured by Defendants' statutory violations and are entitled to recover an amount to be determined at trial due to the injuries and loss they suffered as a result of Defendants' negligence.

**SIXTH CAUSE OF ACTION**
**<u>Unjust Enrichment</u>**

191.    Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

192.    As a result of Defendants unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiff and the Class through the payment of the purchase price for Coca-Cola.

193.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from the Plaintiff and the Class, in light of the fact that the Coca-Cola purchased by Plaintiff and the Class was an illegal product and was not what Defendants represented it to be. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to the Plaintiff and the Class for the monies paid to Defendants for Coca-Cola.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury of his claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all other similarly situated persons, pray for judgment against Defendants as follows:

A.     For an order certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

B.     For an order awarding, as appropriate, damages, restitution, or disgorgement to Plaintiff and the Class;

C.     For an order requiring Defendants to immediately cease and desist from selling Coca-Cola in violation of law; enjoining Defendants from continuing to market, advertise, distribute, and sell Coca-Cola in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

D.     For all equitable remedies available;

E.     For an order awarding attorneys' fees and costs;

F.     For an order awarding punitive damages;

G.     For an order awarding pre-judgment and post-judgment interest; and

H.     For an order providing such further relief as this Court deems proper.

Dated:  March 18, 2014                          Respectfully submitted,


                                                 /s/ Shannon M. McNulty

                                                Robert A. Clifford
                                                Shannon M. McNulty
                                                120 N. LaSalle
                                                Suite 3100
                                                Chicago, IL 60602
                                                Telephone: (312) 899-9090
                                                Fax:  (312) 251-1160
                                                rac@cliffordlaw.com
                                                smm@cliffordlaw.com

                                                *Attorneys for Plaintiff*